We'll hear argument first this morning, Case 09-804, CIGNA Corp. v. Amara. Mr. Olson. Mr. Chief Justice, and may it please the Court, Congress crafted a carefully balanced ERISA enforcement scheme that enables planned participants to recover planned benefits under Section 502A1B and equitable remedies for ERISA violations under Section 502A3. In this case, respondents are seeking a remedy for misleading planned summaries that violated ERISA. Their remedy, if they were harmed by defective planned summaries, is under 502A3, equitable remedies, not for planned benefits under 502A1B. The section that governs the relief that is sought is a necessary antecedent to any of the other questions in this case. And ERISA carefully structures, and this Court has repeatedly said the Court is not interested and does not — is not willing to alter the structure that Congress carefully crafted and carefully developed over the years to provide remedies with respect to ERISA programs. And the scheme is such that if there is a participant to the plan who is seeking benefits under that plan, Section A1B — subsections A1B of Section 502 provides for relief under the plan. If there are other violations of ERISA, Section 502A3 provides for equitable relief. That is the scheme carefully developed by Congress. Now, in this case, what happened is that Cigna changed its pension program, its ERISA plan, from a defined benefit plan to a cash benefit plan, cash value plan. And it put out, as required by ERISA, summaries of the new plan that the district court found and the court of appeals affirmed were misleading, in the sense that they did not provide all of the information necessary for planned participants to evaluate what was happening. Now, the changes to the plan were lawful. ERISA permitted and does permit these kind of changes to an ERISA plan. There was nothing unlawful about the plan. And the plan changed. And the beneficiaries, the participants to the plan, did not have any choice. Cigna had the right to change the plan. It did change the plan. It did have an obligation under ERISA to provide accurate summaries. And the district court and the court of appeals found that those summaries were not inaccurate. In other words, they were not accurate. In other words, they were not accurate. Ginsburg. Mr. Olson, when you say the employees had no choice, but the district court found, didn't it, that the reason for this plan summary being misleading was that the employer Cigna feared that there might be a backlash on the part of the employees if they found out, if they were told the truth about this plan, that is, that it was less favorable, that they would not have the same benefits that they had under the prior plan? That is correct, Justice Ginsburg. They had no choice in the sense that Cigna could adopt a change in the plan as it did. That was permitted under ERISA. But it was required to give accurate summaries. The choice that you are suggesting and the district court was concerned about is that an individual could have left the employee of Cigna if he or she was unhappy with the change in the plan, or the district court said there could have been some sort of a protest. What we're saying is that the remedy, what was the violation is the summary itself. And we're not challenging that here. That's a finding below. The summary was misleading. But that makes it a violation of ERISA. The summary is not the plan. And Mr. Olson, we've several times referred to the plan as having a range of documents associated with it, not as having just a single written instrument. But we've referred to documents and instruments governing the plan. We did that in Curtis Wright, which is the case that you pinned so much on. We did that in Kennedy. And the statute itself talks about that on numerous occasions, that there are documents and instruments in the plural. And one would think that the SPD is one of those documents and instruments that govern the plan. It's quite clear from the structure of the statute that it is correct, as you suggest, that there may be multiple instruments or documents that are the — create the plan itself. But the summary plan document, the SPD, is not a part of the plan. It is a separate document. It is a summary. It is a succinct statement of what might be in the plan, and it must be accurate and it must be written in comprehensible English. But I would refer the Court to section 1024B2 and 4, which are on pages 3A, 4A, and 5A of the blue brief. That describes the obligations that are required with respect to the summary plan document. And it describes the instruments, both the summary plan document and the instruments that constitute the plan itself in the following sentence. And this is a similar sentence in subsection 4, but I'm reading from subsection 2, which is on 4A of the blue brief. It says, The construction of that sentence has to be that the summary plan description is a separate document. It is not one of those latter category of documents under which the plan was established. And the proof of that, essentially, if English doesn't teach it to us, which I think it does, is the reference to the annual report. No one would say and no one would contend that the annual report is a part of the instruments creating the plan. Kagan. Well, I was struck by something else, Mr. Olson. I was struck by the fact that the statute saying what is in the summary plan description is packed with information that needs to be in the summary plan description. By contrast, the written instrument, which you equate to the plan, the written instrument says barely anything about what has to be in it. It just says the name of the fiduciaries has to be in the written instrument. So it seems clear that this statute is set up so that everything that is important, everything that the employee needs to know and needs to rely upon, is supposed to be in the SPD, not necessarily in the written instrument. Well, the written instruments, as these things turn out, are long, complex documents. They may be 90, 100 pages long. The summary, as you suggest, Congress said, yes, there is a separate document that must state in intelligible English that plan participants can understand the following things, and they must be furnished to plan participants. But they are not the plan document. The way the ERISA is structured. Am I missing something? They cannot be in the SPD unless they are in the plan, isn't that right? So the one cannot be more detailed than the other, can it? The plan can be more detailed than the SPD. Right. But whatever is in the SPD must be in the plan, isn't that right? Well, if the plan is, if the SPD complies with ERISA, yes, it has to be. That's what I'm talking about, of course. Yes, exactly. But not everything that is in the plan, or the plan, as the statute says, the documents that constitute the plan, need not necessarily be in the summary. The word summary plan. But, Mr. Olson, what about the opposite? Because the statute seems to be written so that things are in the SPD which don't need to be in the written instrument, and together they all somehow constitute the plan. Well, I submit that that is not the way the statute is written, and subsections 2 and 4 of the provision that I was referring to make that clear, if the word summary itself did not make that clear. But the Curtis-Wright case, to which you referred to in your earlier question, also proves that. Curtis-Wright case talked about a summary plan description and said it can't modify the plan using plan, summary plan description, in different terms. It cannot modify the plan, which is what the district court here held, unless the plan specifically says that it may be modified in a certain way and that the summary is an appropriate amendment to the plan. So the court, and this was a unanimous decision of this court, was referring to the summary as something that was separate that might modify the plan if the plan itself allows for it to be modified in that fashion. Now, the government says that the summary plan description is a part of the plan and so do Respondents, and that's what the court below — the court below didn't actually find that the SPD was a part of the plan. The court found on the latter pages of its opinion that it was a modification. It was an amendment to the plan. That's inconsistent with the Curtis-Wright case because in this case, the plan itself specifically says that it cannot — does not say that it can be amended by the SPD. I thought that what the district court said was that they would treat the plan as containing what the summary said, not that it was part of the plan itself, not an amendment. Amendment.  I think in the page of the — this is a — this is the summary to the search petition, page 218, which is the district court's — the conclusions of the district court's decision. Under Roman numeral 8, the district court specifically said that the terms of part B have been correspondingly modified by the SPDs. The court was saying — I think you were referring, Justice Ginsburg, to the relief that the court ordered, but the court was ordering that relief on the theory that the SPDs modified the plan, and the plan itself, under Curtis-Wright, doesn't provide for it to be amended in that way, and the SPDs exist. Scalia. Can't be part of the plan without modifying the plan, can it? That's correct. Because it contradicts other provisions. That's correct. And the SPDs, the two SPDs themselves on page 922a and 938a of the joint appendix specifically say that if there's any discrepancy between the SPD and the plan, the plan governs. The language is at the bottom of, for example, at the bottom of 922a. So the SPD can't negate the force of ERISA. And if ERISA says that the summary has to be consistent with the plan documents, nothing in the SPD can negate that requirement. That's correct. No one — but Congress did consider prohibiting a provision like that in SPDs, that they could not disclaim, they could not say that if there's any inconsistency the plan governed, and Congress did not adopt such a provision, this is a perfectly legal provision to tell someone that if there's any discrepancy, and there's bound to be discrepancies, the — as I said, the plans themselves can be 90, 100 pages, and very long and very complex. That's why there's an SPD. They can't contain everything in the plan. And one of the things that would be the outcome of what the government and Respondents are urging here is that plan creators, these companies that create these plans, either will be discouraged from doing it, or they will start preparing summaries that are 90 and 100 pages long. But they can't do that because the statute requires the summary to be understandable and not proleg. That's Catch-22, because if there's a discrepancy, because they have to be short, summary, and intelligible, then we have the — we're faced with a proposition that someone's going to say, well, I read the SPD and it didn't say what was in the plan. If the SPD is as long and as detailed as the plan, then there's a violation of ERISA. My point, I guess, in this is that, yes, Justice Kagan, the statute requires the SPD to contain certain information. We accept the fact of the conclusions of the Court below in this case that they did not do so. There are two SPDs. They failed to live up to the requirements of ERISA. There is a remedy for that. There is a violation of ERISA. And it specifically says in 502A3 that for violations of ERISA, equitable remedies are available. And that is what Congress decided. It is — unless it's a part of the plan, you must go under A3. But the very question here is, if there is an SPD that is inconsistent in some way with the written instrument, what happens? Is the written instrument modified, or instead, is the provision in the SPD given operative effect? And that question is one about your benefits under the plan. I would submit that it can't modify the plan unless the plan permits that. That's Curtis Wright. That's the unanimous decision of this Court. I do think you're over-reading Curtis Wright. Curtis Wright talked about whether a particular provision satisfied the requirement that a plan have an amendment provision. It didn't say anything at all about whether there are provisions that can have operative effect regardless whether they've passed through a formal amendment procedure. It seems to me — I think we might disagree about that respectfully. I think that the sense of the opinion in Curtis Wright was that if you're going to say that this SPD modifies the plan, it can only do so if the plan permits the SPD to modify the plan. Then the Court sent it back to a lower court to determine whether, in fact, the employees that were involved in creating the SPD there had the authority under the plan to modify the plan. Was that done? Breyer. So far we're just discussing, I take it, whether under one, the other side is entitled to their benefits even if they weren't hurt on a contract theory. Is that all right? But I thought we took the case to decide a different issue, and that is, I'll assume you're right, it should have come under three. But I don't know if that's harmful, whether it was three or one, and the question I thought we were going to decide was if you're under three, say, were equities at issue. Now equity is at issue and the district court says, here, we have 27,000 people, and now here's how I'm going to go about this. I'm going to look at this provision mistake here, and the mistake, it seems to me, was likely to cause them harm. And once that's shown, and they showed it, it's likely to cause it harm. We can't be sure, but it's likely. Then it's up to your client to refute case by case that these guys were not, or women were not really harmed, okay? Now, that seems very sensible to me, and if that's the issue we're going to decide, I'd like to hear you explain why that isn't sensible. It's an equitable matter. This is simply a way of going about it. What's wrong with that? Well, in the first place, it is important which section the person is on. Breyer, I agree, but I don't understand. I'm with you on this one so far. It's a different. Okay. So because it's a different defendant, that's the plan is a defendant versus the plan administrator is a defendant, so that's important. Secondly, A3 provides only for remedies that are available in equity. Then the point that you're making with respect to what provision of equity, what is the action that's brought and what is the remedy sought, as this Court talked about in the Verity case, and so, therefore, those are those questions. Now, the Second Circuit said, likely harm. The fact is, as I pointed out at the very beginning, this was a lawful change in a plan, and it's a plan where 27,000 people that were employees were participants in this plan, and they would have had to do, as Justice Ginsburg suggested, either leave the company and suffer some harm or engage in some kind of business. Breyer, you're sounding to me as if you're saying there wasn't likely harm. Okay. Are you conceding that the standard that they used, that the standard was, to go back to the question that you raised at the beginning, whether the showing of likely harm is sufficient in the absence of a rebuttal? Absolutely we are not. Well, that's what I want to hear. What's the argument against that statement? Six of the courts of appeals have held that detrimental reliance is required. If this is an action under A3, under equity, neither the government nor the Respondents dispute the fact that detrimental reliance would be required if you're proceeding in equity under A3. Right. And does likely harm capture that idea? Likely harm is not a demonstration of prejudicial reliance. Why not? Why not? That's the kind of harm they mean. What they mean by harm is they were hurt, brought about by reliance. Well, in the first place, it comes out of the blue. Likely harm, as I suggested, that since this was a legal, lawful change, the people were going to retain their employment, they didn't have a right to opt for one or the other, if they could prove that they were. This is not an action. You object to this decision saying the following. Of course, the lower court said likely harm is necessary. As we understand it, given the context of equity, what that means here is that there was reason to believe, reason to believe, it was probable that or some words like that, that there would have been harm caused by reliance on the misstatement. I think that would not be justified at all. I mean, under equity, as this Court said in the Ling v. Payne case, which is cited in the briefs, this is like an estoppel action. An essential element of an estoppel action is detrimental reliance on the adverse party's misrepresentation. What the district court below did by coming up with this likely harm thing is throw the burden over to the plan or the plan administrator in saying, demonstrate that any one of your, all of your 27,000 members of this purported class somehow were hurt by a change in a plan over which they had no control, over which they had no discretion, unless they were going to leave the building. Ginsburg. But it wasn't the meaning of likely harm, simply that they were promised one thing in the plan document, and so what likely harm is, is we have to do away with the, what they call, what is it, the wear-away effect. So that's the harm, the wear-away effect, and we have to remedy that, and the way to remedy it is to treat this as, what is it, instead of A or B, A plus B. And that would be an action to seek benefits under the plan, which would be an A-1-B  Yes. Against the plan, the record suggests in various parts, I can't remember exactly which page to refer to, that $70 million would be the consequence of this against the plan, of which some people, depending upon how long they were with the company, when they left the company, whether they were about to retire, whether they stayed longer and the interest rates fluctuated, there can be all innumerable permutations of the effect upon persons. But the plan as you And you can't require, it seems to me, each individual to make a calculation about whether they have actually been harmed, whether there's detrimental reliance. The whole point of these plans is to give people some comfort and assurance when they're age whatever that don't worry, retirement is taken care of, or at least I can rely on that. And your formulation would sort of put that up in the air and say, we don't know if you're going to be harmed or not, wait until you're 65 and we'll see. Well, Chief Justice, Mr. Chief Justice, that is the statute. The statute gives you a relief with respect to a misleading plan summary under the laws of equity. The laws of equity would require that the person say, demonstrate in some way that they were harmed. The Respondents in this case, the named members of the class, claim that they were out $30-some-thousand each. They would have an incentive to bring an action by themselves. But it couldn't be brought as a class action, and isn't that a large piece of this picture, that proceeding as they did, they can proceed as a class? Proceeding under detrimental reliance would be hard to get a class, because it would be an individual case of detrimental reliance. The Rules Enabling Act provide that a class mechanism cannot change the substantive provisions of law. And so it cannot be that because this is brought as a class action, the rules of equity somehow change. Ginsburg. No, the question is, under the section that the district court proceeded under, not the one that you say is proper, a class action would be appropriate? A class action might be appropriate, but it would not change the detrimental reliance requirement. Again, this is a class action. Kennedy. I have a question to A3. I have two questions. One is, as you — and this is probably for your friends on the other side more than you — but as you understand the likely harm standard that prevails in the Second Circuit, this likely harm to a majority of the members of the class, all the members of the class, do you know, has the Second Circuit told us what that means? Yes, well, the Second Circuit suggested, and the government and Respondent particularly the Respondents say, if there is a material difference, likely harm is presumed. And the government itself says — Likely harm to whom? I think that's the question. That is the question. As Justice Kennedy is asking, and I have the same question. Does it mean likely — is it likely that the class as a whole has been harmed? Or that each — is it likely that each individual member of the class has been harmed? Or a significant number. Or a majority or whatever. What does likely harm mean? Do we know that? I totally agree with the import of those questions. You can't describe that in this — My question had no import. I really wanted to know the answer. Well, the answer — the answer is what the district court ordered and the government seeks and the Respondents seek is they are all harmed by this. That there is any material disparity, then everybody — It wouldn't be too hard if they are joined as members of a class in light of a certain set of characteristics. And the judge would find that other things being equal, individuals who have that set of characteristics which in this circumstance make them members of the class, would be harmed in all likelihood. Okay? Done. Now, it's up to — it's up to the defendant, then, to show that in a particular case this individual wasn't harmed. It defies reality, Justice Breyer, to suggest that the 27,000 people, each one occupied by a different position in terms of the length of their employment, when they might be retiring, what their benefits might be, whether they might take a lump sum or an annuity, all of those things are different. And the only way they could have been harmed, Justice Breyer, is if they had otherwise decided to leave the employ of the company and go someplace else. They could have demonstrated that. If I could say for example — Kennedy Doesn't Mertens bar the award of monetary damages? Verrilli, I think it would. I mean, this Court— Kennedy Well, then you're not offering as much as, oh, please go under A3, but then you go back and say, oh, well, you can't get monetary damages. Verrilli, first place, that's Congress's choice. It's an equitable remedy that would be required. Congress made that decision. This Court has said it's not going to reconstruct what Congress carefully did. The thing is that it would have to balance people wanting to create these plans and go into these plans, and the solvency and stability of the plan, what Justice Breyer is suggesting, the second sort suggested, is that you would expose plans to enormous liability because someone might think that someone might have left the employ of the company and taken a different job. That's not realistic. And that's why it just came out of thin air. If I may. Roberts Thank you, Mr. Olson. Mr. Bruce. Bruce Mr. Chief Justice, and may it please the Court, our position is that detrimental reliance is not found in section 102 of ERISA, which establishes the summary plan description requirements. It's not found in section 404A1D of ERISA, which establishes the fiduciary duty to act in accordance with the plan documents and instruments, plural, insofar as consistent with the provisions of this title. It's also not consistent with any language in section 502A, either in 502A1B or 502A3. The reference to equitable relief is to appropriate equitable relief to redress a violation of Title I or a violation of the terms of the plan. Kennedy Well, that seems to me like just a roundabout complex way of saying that you must recover under the plan, because if reliance is not required, then there must be some basis on which you must recover, and that recovery must be under the plan. So it's the the Kennedy I mean, if you say injury is not required, then I don't see how the SPD can give you recovery, unless the SPD is the plan, which brings us right back to the argument, which is your argument, under the first section, under A. Under either A1. A1. The SPD is effectively providing an injunction in a case like this, where an action violates the statute. And here, a plan provision which had a very detrimental effect on people was not disclosed to them. And so the effect of the statute is to make that unfavorable provision ineffective. And so Alito If the SPD is part of the plan, then where does the likely harm standard come from? Kennedy I think as we said in our brief, we think that the likely harm, possible prejudice, and the material conflict that is used in the Third Circuit in Burstein, we think that all of those standards are very similar. They're really looking at whether Alito No, but why is there any requirement whatsoever, other than the fact that it's in the plan? If the SPD is the plan and the SPD says you get certain benefits that you wouldn't get under the written document, then the previously executed written document, then you get the benefits under the SPD, period. It doesn't matter whether there's likely harm or reliance or anything else, right? Well, I think, Justice Alito, we see this more as a nondisclosure issue, that the unfavorable provisions in the plan were not disclosed, and that the effect of the statute is to make those unfavorable plan provisions ineffective. But because the statute refers to, for example, material modifications and being there, where the court can look and see, is this really, was this conflict, was it really about something that was significant to people that might have an impact on their decisionmaking, and whether the terms of their employment are satisfactory, whether they might want to seek another job, they might just go into the office and say, we need more benefits. Roberts It seems to me that it's a very tough argument to say, to make a nondisclosure claim on the theory that the summary is part of the plan, because the whole point of a summary is not to disclose everything. If it disclosed everything, it wouldn't be a summary. And if it can claim something because it didn't disclose it, it seems to me that's in tension with the idea that it's not supposed to be just a repetition of the plan. Our position is that the SPD is one of the documents or instruments governing the plan. And by statute, it's required to have certain, to meet certain requirements, and therefore it becomes a document governing the plan. It is, in response to Mr. Olson, it is referred to as a document in section 1024A6 of the statute. And of course, this Court has repeatedly referred to it as a plan document and to plan documents plural. So what's the point? Ginsburg. But as I think the brief, the Petitioner's brief pointed out, it governs the plan only when it's more favorable to the participants, because you wouldn't say if the plan were more favorable and the summary would show fewer benefits, that the summary would then govern. I think the favorable-unfavorable is that the way I see it is that an unfavorable plan term, when you look at Curtis Wright, an unfavorable plan term must be validly adopted, and it must be disclosed in accordance with ERISA in order to be effective. And so in the Frommert v. Conkright case, that was specifically what the Second Circuit held, was that the summary plan description did not disclose the phantom offset, and therefore the phantom offset was ineffective. Here the summary plan description did not disclose the wear-away provisions. So what I think is people's normal expectation is that if they are under a pension plan and they are continuing to work, that they are continuing to earn pension benefits, so that the SPD was not apprising them that there were unfavorable provisions in the plan which were validly adopted, but which were secret as far as they were concerned. Kennedy. So there's a presumption that everything in the plan is favorable? I still don't understand how you get it both ways. If it understates the benefits, that doesn't count. The Congress in ERISA is concerned with unfavorable effects on participants. It's about protecting employee rights. So the focus is on losses of benefits, and there's a specific provision in the regulations and in the statute about disclosing all the circumstances that can result in a loss of benefits. So there was a plan provision here which caused a loss of benefits that was never disclosed to people. And it was — there was no baseline where people knew, well, the plan document may have a wear-away provision and the SPD doesn't mention it and therefore there's no wear-away. They didn't know what wear-away was. They don't know what wear-away is today, because it's never been disclosed to them that there's a way to rig up a pension plan where you can have a period of years unbeknownst to you where you're not earning any additional benefits. Breyer, are you finished with that? Yes, I'm sorry. If you're finished, as I understand what you've been saying and written, you don't mean that the SPD, the summary, is a contract. I mean, one thing would be to say it's a part of the plan and, moreover, it's a contract. So therefore, we enforce it according to terms. That's one view. But if you took that view, you'd get into problems such as were mentioned. The employer would write 10,000 pages because he knows it's an enforceable contract. Nobody would understand it. You'd have to worry about the time when it was less favorable than the written document. So call it a plan if you want, as long as you don't mean it's an enforceable contract. Now, there's a provision that deals with it, saying just what you said in response to Justice Alito. And what I don't understand is why wouldn't that provision govern? I take it there's a provision, 1054g1, that says a plan cannot reduce the rate of accrual of future benefits unless there's written notice in a manner calculated to be understood by the average plan participant. So I would have thought, I read that, I get what you've said in your brief, the summary was inadequate. It wouldn't have been understood. And therefore, according to this particular provision, those provisions in the plan that reduce benefits are void. So now we enforce the plan with the — in the absence of those particular void provisions, and you get what you want. Now, I thought that makes a lot of sense to me, except I don't see that anywhere in this case. So there's some reason it doesn't seem to appear in the opinions, it doesn't appear in the briefs, it doesn't appear anywhere, until you just mentioned it in response to Justice Alito. It seemed to. It is in the opinion. It is. The district court found a violation. It's 1024h, 204h of ERISA, that that provision, the district court found a violation of that provision, which, if the court had provided relief, would have resulted in the class receiving much more relief than the court ultimately ordered, that it would have resulted in the class receiving four or five times as much relief, because they would have just been put back under the old pension formula. Was that provision H? It's right, it's H. Does it appear anywhere in the briefs? 1024h, does it appear anywhere in the briefs? It appears in our petition for certiorari, because after the district court found a violation of it, the district court declined to provide relief because there had been an intermediate interim amendment that might have taken place. Breyer. I understand that. So suppose we can't reach that, which would seem to be the logical thing to govern this, but we can't, okay? Then we have only two choices. The first choice is 1B, which seems to you want to use that by treating the summary as a contract, or we go to 3, in which case we are under equity. Between those two, the first one gets all the problems that we just were talking about. The second one would seem to be you are free and clear as long as you show some kind of reliance and harm, and then we are back to what I thought we granted this for, which is, why not say if harm is likely, then the burden shifts? That's one way that it would be the way it's approached under the Securities Act, where there is an express reliance requirement. What happens in a trust law where, let's say, there are 10 or 50,000 beneficiaries in a trust, and the trustee has indeed made an error, and now they can recover money only if, you know, only if there really has been harm. Now, how does trust law work that out? This can't be the first time this ever arose in history. We have a big class. Well, we didn't go based on a trust law case involving a big class, but we based it on Bogert and on Section 173 in the Restatement of Trusts, that when there is a breach of the duty to disclose all the material information that the beneficiary needs to know in interacting with a third party, which in this case would be Cigna, with respect to their employment, that then there is no requirement of proving reliance, that the trustee can prove, as the Second Circuit set up, that the trustee can try and prove that the beneficiary had all the information that they needed. So you say under standard trust law, once you show there's a breach, the burden shifts to the trustee to show that there's no harm? A breach of the duty to disclose all the information that the beneficiary needs to know in interacting  I mean, I understand that to be the Second Circuit rule, but I didn't understand that to be the rule generally in the law of trust. And I quarrel with the government's brief on that. I think the government's brief is quite wrong to suggest that this is part of the law of trust. Now, it could be the law of ERISA under the Second Circuit, but that's something quite different. No, my understanding is, I mean, that's the law that's been enacted, that this Court has adopted in securities cases, where we have nondisclosures to broad classes, is that there's a presumption of reliance, which, because it's unrealistic for thousands of people to prove reliance, and But that's not under trust law, correct me if I'm wrong. Well, that's what I'm saying, that there's a commonality between the securities cases, trust law as stated in the comment to Section 173 and in Bogert, and what the Second Circuit is doing. Could I just add, the securities cases, does that involve stock traded in a market, in which case the inference of harm would be much more obvious and follow more logically than in the trust context? Well, one of this Court's very first ERISA cases was Teamsters v. Daniel, in which the Securities and Exchange Commission had considered pension plans to be a security, and the case actually involved break-in service rules. And this Court concluded that whatever protections the securities laws offered, potentially offered to participants, were now offered in more concrete form under ERISA. But the point that I want to get back to on reliance is that my reading of this Court's decision in Bridge and in Ling v. Payne is that this Court does not look for the closest analogy to a statutory provision. The question is, what did Congress do in enacting this statutory provision? Could I ask you this? If this were an individual action and it were under A3, what would either the plaintiff or the defendant have to show, depending on who has the burden, on the issue of likely harm? What would likely harm mean in that context? The person was likely to have left the employment of the company or what else? Likely harm can include that if the person knew about the provision, they might have asked for the provision to be changed. They might have asked for a different compensation package. They might have asked, they might have taken personal kind of self-help steps to protect themselves, so that they might have, you know, decided to have their wife work longer. They might have decided to work longer themselves. They could have saved differently. There's both the steps that you can take in relation to your employment and the steps that you can take on a personal basis. Breyer.  Breyer. Breyer. They could have gone and said to the company, look, why are you doing this? If interest rates fall, we're going to lose money. But interest rates might rise. And if interest rates rise, you'll lose money. So we're risk averse, so what we would like to do is just make sure we get the same pension that we would under Plan A and then if there's more on Plan B, add it in.  Right. The district court can't do that. Well, the district court found that there was a real prospect of employee backlash if the employees knew about these benefit reductions. It's well established in behavioral economics that people are very averse to losses. So if the statute and the regulations are requiring a loss to be disclosed, it isn't going out on a limb to say that there's going to be a reaction to that. And here Cigna knew that there was a reaction to that. And they had examples from the press of with Deloitte and Touche had had a similar situation where they had to roll back the cash balance changes because employees were so upset. I think in response to Justice Alito's question, I don't think that the individual has to, that if the individual has to prove possible prejudice, that I think that is our district court ruled here, that I think the standard inevitably becomes very close to actual prejudice. And so I think that the possible prejudice is really to the employee group. It's to, that the statute is in terms of the average plan participant. It's all based on objective standards. Kennedy. Under your proposal, I assume, if you prevail, under your position, the summaries will now become part of the plan so that even if there's no intent to mislead, there can be a class action if the SPD is anyhow at variance with the plan. And to the detriment of the employee. Well, as we said in the brief, there are already cases that recognize exceptions to liability here. And one of them is for prompt correction of any problem. So if you have the unintentional error in that unintentionally the wear-away provisions weren't disclosed, well, then the issue is why wasn't that corrected at any point in time? We're now 12 years out, and Cigna has never disclosed those wear-aways to anyone. If an administrator issues a summary plan description that is 100 pages long and is basically the same thing as the written instrument, and that's a violation of the requirement in ERISA that it be a summary and that it be intelligible to ordinary readers, what remedy is available to a beneficiary? I think that that, obviously, injunctive relief in terms of an order to correct that would be available. I think in terms of affecting the benefit offers of saying, well, that is, if the SPD is identical to the plan document, is there any, there are no undisclosed plan provisions then. So it becomes more difficult in terms of relief. But obviously, there would be relief for the understandability requirement. Alitoson Well, doesn't that put the, think of the incentives for the administrator in that situation or for the plan sponsor. If you issue a succinct SPD, you risk misleading the recipients as to the contents of the plan, and you may have financial liability. If, on the other hand, you issue, you are on the side of issuing a, an SPD that is comprehensive, well, the worst that can happen, according to what you just said, is you can be faced with an injunction to provide a more concise and comprehensible statement. Well, intentional errors should not be countenance. And here, Cigna was deliberately misleading employees. If it's an unintentional error, then it should be promptly corrected.  Roberts. Thank you, counsel. Thank you. Mr. Kneedler. Mr. Chief Justice, and may it please the Court. The pension benefits an employee accrues while she works are a major component of her compensation for working, just as her wages are. The employee is entitled to receive those benefits and to recover them if they are withheld, without any particularized showing of detrimental reliance, just as she is entitled to recover the wages that were promised to her. Mr. Kneedler, do you view this as essentially a contract case, as that just suggested, or instead a trust case? We view it as basically a contract case. In Firestone, the Court referred to contractually guaranteed benefits, those under the plan. And the reason we think that here, in this case the district court found that the SPD basically promised, represented to employees, that after the conversion, they would receive pension benefits in the form of A plus B, the old benefits plus the new benefits accruing right away. ERISA, the scheme of ERISA, is that the SPD is often typically the only document that the employee receives to inform him or her about the contents of the plan. If this is a contract case, then where does the likely harm standard come from? If I'm owed something under a contract, I'm entitled to get that under the contract. I don't need to show that I was likely harmed by or that I relied in any way on anything. Right. We do not think detrimental reliance. And I think it works out. Do you think likely harm is required? In this sense. If the SPD contains these sorts of representations such that the employee could reasonably be expected to rely upon them in defining her benefits, then that controls. The likely harm is not being told or being told something different from what the underlying plan says. That can be rebutted. Scalia. That's not the likely harm. That's the breach. That's the offense. You're saying once you make the offense, you have to cough up what you stated in the summary. Unless the participant actually knew or couldn't reasonably depend upon it, actually knew, for example, this was the case in the Govoni case in the First Circuit, whose formulation is the one that other courts typically follow. That was a situation where the employee found out before she retired what the true facts were, and therefore there could have been no claim of harm or that the SPD would get away from the contract. Is it contract or not contract? No, it is contract, because the question is what is the contract. To the employee, typically the SPD is the only thing that is the contract. Breyer. The SPD is written by the fiduciary, and the other is written by the person who is giving the money, the employer. So now you're saying that it's a contract, even though it wasn't written by the employer, and even though it could differ in dozens of ways from the actual plan document, sometimes they'd be favorable to the employee, sometimes they'd be unfavorable, sometimes they'd be different but neutral. So what's the judge supposed to do? Forget about the basic document and just enforce this thing written by the fiduciary? Well, the underlying formal document is what controls unless the SPD, unless there's a conflict. This case is not a conflict. Well, I said that there can be conflicts, sometimes favorable to the employee, sometimes unfavorable, sometimes neutral. So what we have is a document that's, by the way, supposed to be short, but I guess if we took your view, it wouldn't be short anymore. And it could differ in any one of three ways. And I could think of seven other ways, and we'll find seven others. So how is a judge supposed to react? He's supposed to say that this two-page document is the contract, is the contract, and there are all kinds of conflicts. What's supposed to happen? It forms part of the contract. And cases of conflicts between the SPD and the formal plan document are not common, and they shouldn't be, because the SPD, the administrator or the employer has an obligation to make sure that the SPD does. That isn't my question. My question is, one, why should a document written by a different person, the fiduciary, govern over the actual plan? Second, what happens when you have a favorable conflict? What happens when you have an unfavorable conflict? What happens when you have a neutral conflict? How should it be worked out? As to the first point, it is common, and it was critically true here, that the employer, the plan sponsor, is involved in drafting the SPD. This was an SPD that was issued in conjunction with the plan amendment, and the SPD and the penitentiary. I don't think the fact that this individual in this case happened to be the same group or person is beside the point of my question. Okay. And so the second point is, I think it would be useful for the Court to look to the experience of certificates of insurance under group insurance plans. That is the most directly analogous circumstance in our view. It is the prevailing position in the courts, and it has been for some time, that where an employee receipt or employee under a group health plan or pension plan receives a certificate of insurance that sets forth certain elements, essential elements of the plan, and the underlying insurance policy is in conflict with that, that the certificate of insurance governs for the same reason that the SPD governs. Scalia. Is this governed by ERISA, or are these things governed by ERISA? Some of them may be, and some of them may not be. I mean, if it's not. But where does the rule come from? The rule is a common insurance rule that in the group insurance situation where you have an underlying policy that the individual insured is not going to see. Scalia. We have a statute here which says that it is the plan that governs. I mean, that's – don't you think that's a crucial difference? Well, but there's – it's also a statute that, as this Court said in Curtis Wright, that the SPD is designed to furnish the employee the essential information under the plan. Is that true of the certificate of insurance? Is a certificate of insurance a simple document that any consumer is able to understand what it's supposed to be? That is what it's supposed to be. And importantly in that case. Is there an example I could look at? I'm sure there's not in the record in this case, but we cite some insurance treatises. And a further point I want to make is that they use a likely harm standard. Is that where the likely harm standard comes from? No, the likely harm standard was a formulation of the Second Circuit. That's nice. Where did they get it from? They just made it up? Well, I think it was an effort to judge whether the particular statements in the SPD were of the sort that – I think it really gets at materiality. Mr. Kneedler, I think it's a hard question here as to whether to think of this as more like a contract dispute or more like a trust issue. If we were to look at it as a trust issue, what would be the result of that? What kind of test would we use? I think it would be the same thing, where you have either, in this case, an affirmative representation of what the – of what benefits will be due, or you could have a situation where there was a failure to disclose. Well, but if it's a contract case, as you're submitting, then the burden-shifting rules, it seems to me, that apply in trust don't apply. Well, the burden-shifting rule would apply to the extent of enabling the administrator or the planner or the employer to demonstrate that the employee actually knew or that there were other documents that would have informed the employee so that he would not have been misled by the statements in the SPD. Kennedy, you have brochures. Kennedy, well, and in all events, I think under trust law, there has to be a showing of breach and harm before there's the burden shifts on causation. And your brief left out that you indicated the burden shifts just so long as you show that there is a misstatement. There is harm because the employee was not told of what the terms of his deal were. He goes to work every day expecting to earn his wages and expecting to earn the benefits that are set forth in the SPD. And in the case of trust law, there is no such requirement with respect to the plan. And that is critical to our position. And again, the insurance certificate of insurance analogy, it's all the same reasons that we say under ERISA, that that's the only document that is given, it's given  of telling the employee the essential aspects of the deal that he's going to get. And ERISA identifies, itemizes what they are and requires that the plan administrator not, not, not minimize what they are. Scalia, it can't amend the plan, contrary to what we've said. It's not, it's not an amendment to the plan. It's not an amendment? It's, the SPD, the SPD is part of the plan and it, and as far as. Wait, wait, it's part of the plan, but, but the, the other part of the plan contradicts this part of it. And, and you say it is this part, the SPT, that, that governs, which means it amends the prior part, right? It, it, it controls. It doesn't formally, it doesn't formally. Okay, we'll say it controls. Does that make you feel better about it? Well, that's, that's the explanation. Does it control when it's less favorable? It, it does not. The under, the under, the underlying. It only controls when it's more favorable, but not when it's less favorable. Because. What theory of contract law gets you to that conclusion? Because you have two different documents that may be part of the contract. It's a, it's an effort to find out what the deal is. Under the insurance cases that I mentioned, what the Court says is, what the Courts say is the certificate becomes part of the contract. But those cases also say when the, when the plan is more favorable, that the plan governs, because that, under ERISA, that is the operative plan document that the Administrator is supposed to operate under day to day. Thank you, Mr. Kneedler. Mr. Olson, you have four minutes remaining. Thank you, Mr. Chief Justice. I'd like to refer, first of all, to what Respondents said and referred in a response to your question from you, Justice Breyer, about section 204G. And you, well, G, I'm talking about, that's what they, I, I refer you to page 212 of the cert petition appendix under Roman numeral VI, where the district court specifically said, Plaintiffs also seek to assert their claim under ERISA's anti-cutback provision 204G, that has been, that claim has been rejected in the liability decision. That claim was raised, it was rejected in the liability decision, it's not here anymore. Section, the real section that the Court should refer to in 204 is 204H, H6A of ERISA, and I can't point to the portion of the appendix, but that was an addition by Congress in 2001 to a deal with egregiously inaccurate notices of change. That, Congress amended ERISA in 2001, added that provision, and said if there's an egregious violation of that provision, then you get all the benefits that you should have gotten. That's what Congress can do if it wishes to do. That's what's being sought in this case. Congress can take care of this if it wishes. But Congress enacted a carefully reticulated scheme. You're either suing for benefits under the plan or you're suing for violations of ERISA. Scalia Why didn't that H apply here? It was not egregious enough? Is that why it didn't apply or they just forgot about it or what? Olson I have, I don't think that the notice that was involved was referring to the SPD. The SPD, to the extent that it violates ERISA, there is a remedy that still exists. Congress hasn't changed. It's in A3. It must be an equitable remedy. You can seek an injunction. And to the extent that the Court is concerned that that's an empty remedy, that that's not a sufficient remedy, that's what Congress decided. And we referred in footnote 3 of our reply brief of a number of cases that circuit courts have handled demonstrating detrimental reliance and providing for remedy. Breyer But I still had the same question Justice Scalia had, which is why didn't this H thing apply here, because they didn't have their claim, the notice wasn't good, and if the notice wasn't good, then the plan didn't change. And if the plan didn't change, they should have gotten the money. Olson That provision doesn't apply to the SPD and they did not bring that case. I don't know. Scalia Why didn't it apply to the SPD? Isn't that a notice? Olson I think it's a different type of notice that is covered by that provision. Scalia There was a notice, wasn't there? Olson There was a notice. Alito And is the claim based on that or is it based on the SPD? Olson The claim is based upon the SPD, and the district court decided that the SPD had amended the plan, and that's inconsistent with what the statute provides. Kagan Mr. Olson, on your view of showing detrimental reliance, I take it you would require each employee to come forward and say, yes, I read this SPD, is that correct? Olson Yes, and trust law. Kagan Doesn't that really misunderstand the realities of the workplace? Very few people read their SPDs, but you only need one person to read the SPD to come in and say, by the way, folks, 21,000 of us are not getting our retirement benefits for the next few years, and within a day, every employee in the workplace is going to know about that. So doesn't this give an incredible windfall to your clients, Cigna, or to other companies that commit this kind of intentional misconduct? If you hold them to this detrimental reliance standard? Olson There's the — I refer to what Justice Kennedy was referring to, to the extent that we are talking about trust law, we are talking about the requirement of a loss. I would say that a person would not necessarily have to have read the SPD, but have been aware of it and taken some steps in connection with it, and that's the evidence that would have to be established, and there's no — and every court has said that under A3, equity requires detrimental reliance. Thank you, Mr. Olson. The case is submitted.